## Case No. 15,285.

### UNITED STATES v. HALL.

[2 Wash. C. C. 366.] [1]

Circuit Court, D. Pennsylvania.    Oct. Term, 1809. [2]

EMBARGO—BOND—DANGERS OF THE SEAS—EX POST FACTO LAWS—DEFENCE—SUBSEQUENT LAW.

1. Action on a bond, executed according to the provisions of the embargo laws, with condition to reland a cargo laden at Philadelphia, at Portland, the dangers of the seas excepted. The vessel was driven, by stress of weather, from the coast, and put into Porto Rico, where she was ordered by the governor to unlade and sell her cargo. The cargo was sold at Porto Rico, and the vessel, after being repaired, returned to the United States.

[Cited in Dixon v. U. S., Case No. 3,934.]

2. What constitutes a peril of the sea, is a question of law.

3. The accident, which is attributable to a peril of the sea, must happen without fault or negligence in the master, and must occur at sea; or if on land, it must be the immediate and necessary consequence of a peril happening at sea.

4. An ex post facto law is one which, in its operation, makes that criminal or penal, which was not so at the time when the action was performed; or which increases the punishment; or which in relation to the offence or its consequences, alters the situation of a party, to his disadvantage.

[Cited in Kring v. Missouri, 107 U. S. 229, 2 Sup. Ct. 449.]

[Distinguished in City Council of Anderson v. O'Donnell (S. C.) 7 S. E. 526. Cited in Garvey v. People, 6 Colo. 559; Lindsey v. State (Miss.) 5 South. 101; People v. McNulty (Cal.) 28 Pac. 827; Sage v. State (Ind. Sup.) 26 N. E. 669; U. S. v. Cannon (Utah) 7 Pac. 388; Re Wright (Wyo.) 27 Pac. 566.]

5. If a defendant has incurred a forfeiture, and seeks to avail himself of a defence granted to him by a subsequent law, to which he was not entitled at the time when the act for which the penalty is given, was performed: he must take it, subject to such terms and conditions, as the legislature, at the time it passed the beneficial law, or at any future time, might please to prescribe.

Action upon an embargo bond given by the defendant, on the 27th of December, 1807, with condition to reland the cargo taken in for Portland, within the United States, the dangers of the seas only excepted. It appeared in evidence, that the vessel sailed on her voyage, and on the 3d of January, 1808, had proceeded as far as the Nantucket shoals, when she got on them, and the weather became so boisterous and severe, that the men were nearly disabled, by the frost, from navigating the vessel; and they applied to the master to leave the coast, and seek some more southern port. The wind, which opposed their progress to Portland, was favourable for Charleston; and the master determined to steer for that port. On the 10th, the vessel came off Charleston, but the wind was such as to prevent her from approaching it; and the disability of the crew still continuing, the master was compelled to steer her before the wind, and to proceed to the southward. He then determined to proceed to Porto Rico to repair, the vessel having suffered considerably by the weather, and being in a leaky condition. She arrived at Porto Rico on the 17th; and on the 28th, she was ordered by the governor to unload, and was, by the same order, prohibited from taking away her cargo from the island, but was permitted to dispose of it there. The captain accordingly sold his cargo, repaired his vessel, and returned to the United States on the 9th of March. It appeared in evidence, that the vessel, when at Porto Rico, could not have returned to the United States without repairing.

The reality of the necessity, which compelled the defendant to put into Porto Rico, or from returning with his cargo to the United States, was questioned by the district attorney. But if the evidence was believed, he contended, that the prohibition of the governor to bring away the cargo, was not a peril of the sea—as to what are dangers of the sea, he cited Abbot, 202, 205, 203, 204, 207–209, 211; 1 T. Rep. 31. 1 Bac. Abr. 355. Park, 61. Peake, 212, 262. 2 Marsh. 418. Park, 63. Bunb. 37. If the defendant relied upon the act of the 12th of March 1808 [2 Stat. 473], which speaks of unavoidable accidents, it was contended that there must be a loss by unavoidable accident, which did not happen in this case; and, at all events, the enforcing law declares, that this evidence shall not be given, except upon terms which have not been complied with.

Hopkinson, Ingersoll, Levy, and Peters, for the defendants, contended, that what constituted a peril of the sea, was matter of fact for the jury, under direction of the court. Abbot, 165. That the order to land, and the prohibition to carry away the cargo, were a consequence of the vessel being forced into Porto Rico in distress, and were a peril of the sea. That the vessel was incapable of returning from Porto Rico, without repairs, which the defendant was not bound to make, in order to save his bond. But, at all events, the act of the 12th of March was conclusive; and if the enforcing act was to be construed so as to deprive the defendant of the advantage granted by this law, it was ex post facto, and void. But, in truth, the enforcing act, by declaring that if the certificate of relanding shall not be returned in two months from the date of the bond, suit shall be brought, shows that the law can only apply in cases where the bond has been given within two months of the passage of the law. As to the construction of laws, and their invalidity if unjust or impossible, Bonham's Case [8 Coke, 114] Plow. 205, was cited.

---

1 [Originally published from the MSS. of Hon. Bushrod Washington, Associate Justice of the Supreme Court of the United States, under the supervision of Richard Peters, Jr., Esq.]

2 [Affirmed in 6 Cranch (10 U. S.) 171.]

WASHINGTON, Circuit Justice (charging jury). After stating the evidence—the first question is, whether the defendant was prevented, by a peril of the sea, from relanding his cargo at some port in the United States? What constitutes a peril of the sea, is a question of law. Whether the defendant was prevented by such peril from complying with the condition of his bond, is a fact for you to determine. It is true, the question will sometimes become, in process of time, a point of law, which, depending originally on extraneous evidence, had been submitted to the determination of the jury, as a question of fact. In mercantile transactions, particularly, it has often become necessary, in order to arrive at the real intention of the parties, to inquire into the meaning of certain phrases, used in commercial instruments, perfectly well understood by those who use them, but which are otherwise ambiguous, and sometimes unintelligible. When the meaning of those terms is once ascertained, public convenience requires that they should receive a legal definition, and be considered as immutable. Infinite confusion and uncertainty would prevail in legal proceedings, if the construction of commercial any more than of other instruments, should be confided to the jury, who might in one case decide one way, and vary it in some other, so as in truth to afford in none a rule by which men should govern themselves.

What, then, is the meaning of the expression, "perils of the sea?" Without attempting a definition which should include every possible case, it may safely be laid down, that the accident, which is attributable to this cause, must happen without any fault or negligence in the master, and must occur at sea; or if on land, it must be the immediate and necessary consequence of a peril happening at sea; such as tempests, lightning, loss by pirates, injuries sustained by being run foul of by another vessel, and the like. If a peril of the sea has occurred, but is not the immediate cause of the loss, it cannot be fairly brought within the exception; and in this light I view the order of the government of Porto Rico in relation to this cargo. Adverse winds and severe weather, perils unquestionably of the sea, were the immediate cause of this vessel putting into Porto Rico, in a disabled state; and the order of the government to sell the cargo, was the immediate cause of the defendant's disability to comply with the condition of his bond. A peril of the sea was the remote cause, by placing her in a situation to sustain this injury by the operation of a new cause, but was not itself the cause. The order of the government, therefore, is not to be considered as within the exception. But nevertheless, the defendant was, independent of this order, prevented by a peril of the sea from relanding his cargo in the United States, if the evidence be believed by the jury; because, by that evidence, it appears, that by storms and cold weather, the vessel was not only forced into Porto Rico, but arrived there in so disabled a state, that she could not, without danger to the lives of the crew, have returned to the United States. What then was to be done? The answer is plain—The master was bound to repair if he could, because the perils of the sea had interrupted the voyage. He was bound to do all in his power to return with his cargo to the United States, in order to save his bond. This case has, we think, been very correctly likened by the district attorney to that of a bill of lading. In the one, the master obliges himself to land the cargo at a specified port; in the other, at any port in the United States; and the excuse for not doing so, is the same in both. In the one, the master, if forced by stress of weather to seek an intermediate port, must repair his vessel, if he can, in order to carry his cargo safely to the port to which it is destined. This he must do, if he would avoid the claim of the freighter for damages, for a non-compliance with his contract. And if he means to go farther, and entitle himself to his freight, he must carry the goods, though in some other vessel, if it be not in his power to repair his own. The question then is, could the defendant in this case, have repaired his vessel, to the end of complying with his obligation to the United States? For if after repairing, the government which permitted him to do so, prohibited his departure with the cargo, he was not bound to repair at all in relation to this contract; and without repairing, he could not return with his cargo, in consequence of a peril of the sea. If the law obliges him to do what he can, in order to excuse himself for a non-compliance with his engagement, it imposes this obligation, for no other reason than that, by doing so, he may comply. But if, after repairing, he is still prevented from performing what alone the contract contemplates, the law would operate most capriciously and unjustly, were it to punish him for a non-compliance. It is true, the defendant cannot plead the prevention of the government, as a peril of the sea; but he may avail himself of it, as an excuse for not removing a disability which a peril of the sea had produced; and, in this point of view, that order furnishes this defendant a complete defence, if his conduct throughout has been fair, and no fault or negligence is imputable to him.

This opinion would seem to render the consideration of the other points made in the cause, unnecessary. But as it is possible the jury may not think, from the evidence, that this vessel was disabled from returning to the United States without being repaired; —as there may be cases for trial, where no such disability had resulted from the perils of the sea,—and a gentleman concerned in those cases has been heard upon those other

points; it would be improper in the court not to notice them.

The defendant urges, that although the jury should not think his case to be within the exception of perils of the sea, he is nevertheless permitted, by the act of the 12th of March 1808, to excuse himself, by proving that he was prevented, by unavoidable accident, from relanding his cargo in the United States; and that the conduct of the government of Porto Rico comes within this description. On the other side, it is contended. that it is not enough, under this law, to prove unavoidable accident, unless it was accompanied by a loss of the property; which did not happen in this case, the defendant having received the full value of his cargo.

The truth is, that the words of the law will bear either construction. It may be read thus: "Judgment shall be rendered, unless proof be made of relanding, or of loss by sea, or of other unavoidable accident." Or thus: "unless proof be made of relanding, or of loss by sea, or by (viz. loss by) other unavoidable accident." In such a case, it is the business of the court to prefer that interpretation which is most reasonable, and consistent with the intent of the legislature, so far as it can be collected from the whole system. The object of the law, was to prevent the cargoes of vessels destined from one port in the United States to another, from going to foreign ports; and to punish those who should violate this policy. But it was not deemed just to involve in the same fate, those who could, and those who could not, comply with the law. Perils of the sea were therefore admitted as an excuse, by the first law. But this did not comprehend other perils, equally insurmountable, and consequently, equally excusable. This law, therefore. enlarges the ground of excuse, and gives to the obligor an additional defence. But why should he be excused, in case of a loss by unavoidable accident, and be guilty, if prevented by the same accident from complying with his engagement? He would not be less guilty in the one case than in the other. because he was more unfortunate.

But we are not left to conjecture as to the meaning of the legislature upon this subject; that body having subsequently given a legislative construction of the words, "other unavoidable accident." The act commonly called the enforcing law, declares, that judgment shall be rendered, unless proof be given of relanding, or loss of the vessel; thus far changing the situation of the party, as to require a loss of the vessel, instead of a loss generally to be proved, or perhaps explaining a loss by sea to mean, a loss of the vessel by sea. How far such a change is to be supported, in a case to which this law applies retrospectively, need not now be decided positively; or how far the other parts of the law can be made to operate against the obligor, will be shortly noticed hereafter. But upon the point we are now considering, it is to be observed, that the law then proceeds to declare, that in such suit. no plea shall be filed, or evidence given of capture. distress, or other unavoidable accident except upon certain conditions. Now, where was the necessity of this prohibition to make such a defence, unless some former law had permitted it? For certainly, if no former law had authorized it, it would have been the duty of the court, as much so as it is made their duty by this law, to overrule such plea, and to exclude such evidence. There is no law, but that of the 12th of March, which allows the defendant to give evidence of unavoidable accident; and consequently, this law must refer to that. This law, then, by declaring that unavoidable accident shall be no defence, admits that before that period it would have been a defence, though not accompanied by a loss of vessel or cargo.

But it is said, that this construction would make unavoidable accident an excuse. though it should be attended by no consequences material to the voyage; as, for instance, injury to the vessel or cargo. which, however, might not prevent the latter from being relanded. This construction could never be supported, because from the first embargo law to the last, the only question was, whether the defendant had been prevented from relanding the cargo by those circumstances which are allowed to excuse him. If, then, under either of the laws, he should prove the accident, without which he could not be excused. it is necessary for him also to prove, that the happening of that accident prevented him from complying with his obligation. And he must go farther, and satisfy the jury that the accident was unavoidable, and clear himself also from all imputation of fault or negligence; which is an answer to the other objection stated by the district attorney to this construction, that it would open a door to fraud and collusion.

But it was said, on behalf of the United States, that if the defendant will avail himself of the new defence allowed by the act of the 12th of March, which was given after he had incurred a forfeiture of the bond, he must take it upon the conditions superadded by the enforcing law. To this it is replied by the defendant. that the enforcing law. in respect to cases occurring before its passage, and coming within its operation, is ex post facto, and void. To a certain extent. this may be true. An ex post facto law is one which in its operation makes that criminal or penal, which was not so at the time the action was performed; or which increases the punishment; or in short, which. in relation to the offence, or its consequences, alters the situation of a party. to his disadvantage.

But a law may be ex post facto, in some respects, and not so in others—may be ex-

post facto as to B. and perfectly justifiable as to C. In the former case, the court do not declare the law void, but that it cannot operate against that party. If the enforcing law applies to this case, there can be no doubt that so far as it takes away or impairs the defence which the law had provided the defendant, at the time when the condition of this bond became forfeited, it is ex post facto, and inoperative; for, under the existing law at that time, it was sufficient for the defendant to prove prevention, by any peril of the sea, happening to vessel or cargo; but under the enforcing law, he must prove a loss of the vessel, which may not have happened, and yet a peril of the sea may have totally prevented his relanding the cargo in the United States. But if the defendant has once incurred a forfeiture, and seeks to avail himself of a defence granted him by a subsequent law, to which he was not entitled at the time when the act for which the penalty is given was performed, he must take it, subject to such terms and conditions as the legislature, at the time when it passed this beneficial law, or at any future time, might please to prescribe. In such case, the subsequent law cannot be denominated ex post facto, because it does not in any respect change the condition of the party from what it was when the act was performed. But the enforcing act, in respect to preceding cases, can only be construed to extend to such as admitted of a certificate of relanding being returned to the collector, within two months from the date of the bond; for it cannot be supposed, that the legislature intended to require an impossibility; and every construction should be avoided, if practicable, which would lead to such an absurdity. The enforcing law, therefore, does not extend retrospectively to any case where the bond had been given two months before the law passed; and of course, the defendant, in this case, may avail himself of his defence of prevention by unavoidable accidents, without submitting to the conditions prescribed in the enforcing law. As to the validity of this law, in relation to cases to which it does apply retrospectively, we give no opinion, although unquestionably the court entertains one upon the subject.

Upon the whole, then, if no fault, negligence, or unfair conduct, is imputable to the defendant in going to Porto Rico, and disposing of his cargo, his non-compliance with the condition of his bond is excused, as well by a peril of the sea, which prevented him, as by unavoidable accidents; and in case the jury believe the evidence, and are satisfied of the entire fairness of the defendant's conduct, the verdict ought to be in his favour.

Verdict for defendant.

[A writ of error was subsequently sued out from the supreme court, where the judgment of this court was affirmed. 6 Cranch (10 U. S.) 171.]